The Honorable Jodie Mahony State Representative 406 Armstrong Building El Dorado, AR 71730
Dear Representative Mahony:
This is in response to your request for an opinion several questions involving the Developmental Disabilities Service's ("DDS"), Department of Human Services, ("Department") proposal for contractual arrangements between private non-profit provider agencies and state agency in connection with delivery of individual support services.
You indicate that the arrangements stipulate that the private non-profit agency will be paid an administrative fee of 10% of the contracted amount in payment for cutting the check for an individual that the state agency staff selects and hires to deliver the in-home respite care or other direct client service. Your specific questions in this regard are as follows:
 [I]f the DDS Field Caseworker hires someone to do in-home respite care and the non-profit agency cuts the paycheck:
 1) Would the non-profit agency be considered the employer subject to all wage and hour laws and regulations?
 2) Would the non-profit agency be required to offer the same fringe benefits such as health care coverage as they offer to all other agency employees?
 3) Would the agency be responsible for providing Worker's Compensation coverage?
 4) In the event of physical or sexual abuse, would the non-profit agency cutting the paycheck be considered the employer of the person hired by the DDS Staff and subject to employer liability claims?
 5) What would be the non-profit agency's responsibility for providing appropriate in-service training and monitoring under these arrangements for delivering client services?
In my opinion, the mere fact that the private non-profit agency cuts the paycheck to persons selected by DDS to provide the direct services would not, in itself, trigger established requirements or responsibilities in these questioned areas. The answers to several of your questions appear to turn upon the existence of the employer/employee relationship, and/or the particular contractual arrangements. Significance may also attach to the particular arrangement or to any agreement(s) between the private non-profit provider and the persons providing the direct services.
With regard to your first question, involving wage and hour laws, initial consideration must be given to the federal Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et al. seq.). The applicability of this act will turn on the particular facts, including whether the employer and employee relationship exists for the purposes of the act, and whether the agency is "engaged in commerce." 29 U.S.C. § 206.[1] These issues involve questions of fact and law, [W]hether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. [Citations omitted.]
Bonnette v. California Health and Welfare Agency, 704 F.2d 1465,1470 (9th Cir. 1983).
The ultimate determination, however, must be based ". . . upon the circumstances of the whole activity." Bonnette, supra, at 1469, citing Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947).
With regard to the "engaged in commerce issue," the United States Supreme Court has recognized that the act's purposes ". . . was to extend federal control in this field through the farthest reaches of the channels of interstate commerce." Overstreet v. North Shore Corp., 318 U.S. 125, 128 (1943) [citation omitted.] It should be noted in this regard that the receipt of community block grant money originating from federal programs has been a significant factor in assessing the existence of activities in interstate commerce. See, e.g., Ferguson v. Neighborhood Housing Services,780 F.2d 549 (6th Cir. 1986).
We cannot conclude, based upon the information provided, that the federal act will apply in this instance. The foregoing will hopefully offer guidance, however, in assessing each particular case.
A similar analysis applies under the Minimum Wage Act of the State of Arkansas (A.C.A. 11-4-201 et seq.)2, although it should be noted that this act's definition of "employee" specifically excludes "[a]ny bona fide independent contractor." A.C.A.11-4-203(7)(E). An "independent contractor" is defined as one ". . . who contracts to perform certain work away from the premises of his employer, uses his own methods to accomplish the work, and is subject to the control of the employer only as to the result of his work." A.C.A. 11-4-203(6).
Thus, whether or not the definitions are met for purposes of the several potentially applicable wage and hour laws will depend upon the particular facts surrounding the relationship between the private non-profit agency and the individual providing the direct service. We are aware of no state or federal provision defining this particular relationship. It seems clear, however, that the administrative act of cutting a paycheck would not in itself be determinative.
With regard to your second question involving fringe benefits, we are aware of no general requirement that such benefits be provided. This would, it seems, generally be governed by agreement between the agency and the individual. It should be recognized, however, that the Fair Labor Standards Act, if otherwise applicable, prohibits discrimination on the basis of sex in connection with wage rates. 29 U.S.C. § 206(d). A discriminatory offer of fringe benefits on the basis of sex could conceivably result in a violation of this section. See, e.g., Rabidue v. Osceola Refining Co., 584 F. Supp. 419 (D.C. Mich. 1984), aff'd 805 F.2d 611 (6th Cir. 1986), cert. denied 481 U.S. 1041
(1987).
In response to your third question, the applicability of workers' compensation requirements (A.C.A. 11-9-101 et seq.) will again depend upon the existence of the employer/employee relationship. Benefits are not extended to independent contractors, and the courts have stated that the issue of whether an individual is an independent contractor or an employee will be determined by the facts of each case. See, e.g., Sands v. Stombaugh, 11 Ark. App. 38,40, 665 S.W.2d 902 (1984), citing Franklin v. Arkansas Kraft, Inc., 5 Ark. App. 264, 635 S.W.2d 286 (1982). The following factors have been enumerated by the Arkansas Court of Appeals:
(1) The right to terminate the employment without liability;
 (2) The method of payment, whether by time, job, piece, or other unit of measurement;
 (3) The right to control the means and the method by which the work is done;
 (4) The furnishing, or the obligation to furnish, the necessary tools, equipment, and materials.
Sands v. Stombaugh, supra, 11 Ark. App. at 40.
It should be noted, additionally, that the right of control, and not its exercise, is a factor in making this determination. Julian Martin, Inc. v. Indiana Refrigeration Lines, 262 Ark. 671,560 S.W.2d 228 (1978). Your fourth question focuses upon the agency's potential civil liability for acts of the person providing the individual support services. The agency's liability in this regard would presumably be premised upon a theory of vicarious liability, as a result of an employment relationship (also known as the doctrine of "respondeat superior"). Where the relation of "master" and "servant" exists, the master is responsible to third parties for injuries resulting from wrongful acts or omissions of the servant within the course and scope [o]f his employment. Gray v. McLaughlin, 207 Ark. 191, 179 S.W.2d 686
(1944). The relation of master and servant ordinarily exists wherever the employer retains the right to direct the manner in which the business shall be done, as well as the result to be accomplished. Terry Dairy Co. v. Parker 144 Ark. 401, 223 S.W. 6
(1920). Generally, the employer of an independent contractor is not liable for his negligence. Davis v. Lingl Corp., 277 Ark. 303,641 S.W.2d 27 (1982). The employer may be held liable, however, for the conduct of a careless, reckless or incompetent independent contractor when the employer was negligent in hiring the contractor. Arkansas Pools, Inc. v. Beavers, 281 Ark. 109,661 S.W.2d 395 (1983). The characteristic incident of the "independent contractor" relationship is that the employer of the contractor does not possess the power of controlling the person employed as to the details of the stipulated work, and thus is not answerable for an injury resulting from the manner in which the details of the work are carried out by the independent contractor. Akins v. Oklahoma Gas Elec. Co., 433 F. Supp. 1345 (D.C. Ark. 1977).
The agency's responsibility in this instance for cutting the paycheck would not appear to give rise to the employment relationship upon which a theory of vicarious liability must be premised. As previously noted, however, all of the facts and circumstances surrounding the relationship between the agency and the individual providing the services must be considered.
The immunity granted under A.C.A. 16-120-101 et seq. (Supp. 1987) to members of the board of directors of non-profit corporations should also be noted in response to your fourth question. These persons are not subject to vicarious liability for the negligence of corporate employees or other directors. A.C.A. 16-120-101
(Supp. 1987). Section 16-120-102(a) states in pertinent part that this grant of immunity extends to members of the board of a non-profit corporation that holds a valid federal income tax exemption issued by the Internal Revenue Service. Board members are not immune, however, from liability for their own ordinary or gross negligence or intentional torts. A.C.A. 16-120-103(a) (Supp. 1987).
In my opinion, the answer to your final question will require reference to the particular arrangement(s) or agreements(s) between the private non-profit agency, DDS, the Department, and/or the individuals selected to deliver the services. We have found no controlling state law, rule, or regulation in this regard.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Elisabeth A. Walker.
[1] Section 206(a) of the act sets the wage rates to be paid each employee ". . . who in any work-week is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce." The term "commerce" means "trade, commerce, transportation, transmission, or communication among the several States on [or] between any State and any place outside thereof." 29 U.S.C. § 203(b). The phrase "enterprise engaged in commerce or in the production of goods for commerce" is defined under 29 U.S.C. § 203(s), and includes an enterprise engaged in commerce "which . . . is an activity of a public agency."29 U.S.C. § 203(s)(6). requiring extensive analysis of all surrounding circumstances in each instance. With regard to the employment relationship, the following factors have provided a useful framework for analysis: